Jennifer Stisa Granick (SBN 168423)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
425 California Street, Seventh Floor
San Francisco, CA 94110
Telephone: (415) 343-0758
jgranick@aclu.org

Nathan Freed Wessler (*pro hac vice* to be filed)
Scarlet Kim (*pro hac vice* to be filed)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2500
nwessler@aclu.org
scarletk@aclu.org

Stephen A. Loney, Jr. (*pro hac vice* to be filed)
Ari Shapell (*pro hac vice* to be filed)
AMERICAN CIVIL LIBERTIES UNION OF PENNSYLVANIA
P.O. Box 60173
Philadelphia, PA 19102
Telephone: (215) 592-1513
sloney@aclupa.org
ashapell@aclupa.org

Jacob Snow (SBN 270988)
Nicolas Hidalgo (SBN 339177)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
jsnow@aclunc.org
nhidalgo@aclunc.org

*Attorneys for Movant Jon Doe*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In the Matter of Subpoena Number HSI-DC-2026-007280-001:*<br><br>JON DOE,<br><br>        Movant,<br><br>      v.<br><br>THE UNITED STATES DEPARTMENT OF HOMELAND SECURITY,<br><br>        Respondent. | Misc. Case No.:<br><br>**JON DOE'S NOTICE OF MOTION AND MOTION TO QUASH ADMINISTRATIVE SUBPOENA; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br><br>Date: To be set by the Court<br>Time: To be set by the Court<br>Courtroom: To be set by the Court |

DOE's NOTICE OF MOTION AND MOTION TO QUASH ADMINISTRATIVE SUBPOENA

Misc. Case No._____

## NOTICE OF MOTION AND MOTION TO QUASH

**PLEASE TAKE NOTICE** that pursuant to 8 U.S.C. § 1225(d) and Federal Rules of Civil Procedure 45(d)(3)(A) and 81(a)(5), as soon as this matter may be heard by the United State District Court for the Northern District of California, Jon Doe will, and hereby does, move to quash the administrative "Immigration Enforcement" subpoena issued to Google LLC ("Google"), dated October 30, 2025, by the Department of Homeland Security ("DHS").

This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities in support thereof, the Declaration of Jennifer Stisa Granick and all exhibits attached thereto, the Declaration of Jon Doe and all exhibits attached thereto, all pleadings and papers on file in this action, and such other matters as the Court may consider.

Dated: February 2, 2026                    Respectfully submitted,

                                           AMERICAN CIVIL LIBERTIES UNION FOUNDATION
                                           OF NORTHERN CALIFORNIA, INC.


                                           _/s/ Jacob A. Snow_____
                                           Jacob A. Snow (SBN 270988)
                                           Nicolas Hidalgo (SBN 339177)

                                           *Attorneys for Movant Jon Doe*

1

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. iii

INTRODUCTION .............................................................................................................. 1

STATEMENT OF FACTS .................................................................................................. 3

    I.   The *Washington Post* Articles and Public Concern Over Treatment of Afghan
        Asylum Seekers ................................................................................................... 3

    II.  Jon Doe's Email to a Government Official Regarding H's Case ........................... 4

    III. The Subpoena and Google's Response ................................................................. 5

    IV. DHS Agents' Appearance at Doe's Home Address .............................................. 7

JURISDICTION ................................................................................................................ 8

SUMMARY OF ARGUMENT ........................................................................................... 8

ARGUMENT ..................................................................................................................... 9

    I.   The Subpoena Must Be Quashed Because it Exceeds DHS's Statutory Authority and
        Violates the Fourth Amendment ......................................................................... 9

        A.  Investigating a Non-Threatening Email Sent by a Member of the Public to a
            Government Employee Is Outside the Authority of 8 U.S.C. § 1225(d) and 8
            C.F.R. § 287.4 ........................................................................................ 10

        B.  The Subpoena Seeks Records for an Illegitimate Purpose, and These Records
            Are Not "Material and Relevant" to Any Permissible Investigation ...................... 12

        C.  The Subpoena Violates the Electronic Communications Privacy Act, 18
            U.S.C. § 2703 ........................................................................................ 14

    II.  The Subpoena Also Must be Quashed Because It Was Issued to Retaliate against
        Doe's First Amendment-Protected Speech .......................................................... 15

        A.  The First Amendment Protects Doe's Email to a Government Official About a
            Matter of Public Concern ........................................................................ 16

        B.  The Government Retaliated .................................................................... 17

        C.  Doe's Speech Was a Substantial Motivating Factor. ................................ 19

    III. The Court Should Decide This Motion as Soon as Possible. ................................ 20

CONCLUSION ................................................................................................................. 21

1

**TABLE OF AUTHORITIES**

2

**Cases**

3

*Abbott Laboratories v. Gardner,*
    387 U.S. 136 (1967).................................................................................................. 20

4

*BE & K Construction Co. v. N.L.R.B.,*
    536 U.S. 516 (2002).................................................................................................. 16

5

6

*Bello-Reyes v. Gaynor,*
    985 F.3d 696 (9th Cir. 2021) .................................................................................... 15

7

8

*Boquist v. Courtney,*
    32 F.4th 764 (9th Cir. 2022) ..................................................................................... 19

9

10

*Borough of Duryea. v. Guarnieri,*
    564 U.S. 379 (2011).................................................................................................. 16

11

*Brandenburg v. Ohio,*
    395 U.S. 444 (1969).................................................................................................. 17

12

13

*Bridges v. California,*
    314 U.S. 252 (1941).................................................................................................. 17

14

15

*Bruce v. Ylst,*
    351 F.3d 1283 (9th Cir. 2003) .................................................................................. 19

16

17

*Califano v. Sanders,*
    430 U.S. 99 (1977).................................................................................................... 20

18

19

*California Motor Transportation Co. v. Trucking Unlimited,*
    404 U.S. 508 (1972).................................................................................................. 16

20

*CarePartners, LLC v. Lashway,*
    545 F.3d 867 (9th Cir. 2008) .................................................................................... 19

21

22

*Counterman v. Colorado,*
    600 U.S. 66 (2023).................................................................................................... 17

23

24

*Crawford-El v. Britton,*
    523 U.S. 574 (1998).................................................................................................. 15

25

*E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.,*
    365 U.S. 127 (1961).................................................................................................. 16

26

27

*Evers v. Custer County,*
    745 F.2d 1196 (9th Cir. 1984) .................................................................................. 16

28

*Harris v. United States*,
    413 F.2d 314 (9th Cir. 1969) ................................................................................ 8

*Hartman v. Moore*,
    547 U.S. 250 (2006)........................................................................................... 15

*Hell's Angels Motorcycle Corp. v. County of Monterey*,
    89 F. Supp. 2d 1144 (N.D. Cal. 2000) ............................................................. 20

*In re AT&T Non-Disclosure Order*,
    No. 25-MR-1769, 2025 WL 3079326 (D.N.M. Nov. 4, 2025)........................... 15

*In re Google Inc.*,
    No. 13-MD-02430-LHK, 2013 WL 5423918 (N.D. Cal. Sept. 26, 2013)............ 14

*In re Sealed Case (Admin. Subpoena)*,
    42 F.3d 1412 (D.C. Cir. 1994) ......................................................................... 10

*In re Subpoena No. FY25-ELC-0105, Doe v. U.S. Department of Homeland Security*,
    No. 3:25-mc-80286-TSH (N.D. Cal. Dec. 9, 2025) ............................................ 2

*In re Summons Nos. HSI-PH-2025-082814-001 & HSI-PH-2025-082819-001: Doe v. U.S.
    Department of Homeland Security*,
    No. 3:25-mc-80325-PHK (N.D. Cal. Jan. 28, 2026) .......................................... 2

*Kando v. City of Long Beach*,
    No. 21-56199, 2023 WL 3092304 (9th Cir. Apr. 26, 2023) ......................... 18, 19

*Lacey v. Maricopa County*,
    693 F.3d 896 (9th Cir. 2012) ...................................................................... 18, 19

*McDonald v. Smith*,
    472 U.S. 479 (1985).......................................................................................... 16

*McLane Co. v. E.E.O.C.*,
    581 U.S. 72 (2017)...................................................................................... 10, 12

*Media Matters for America v. Bailey*,
    No. 24-cv-147, 2024 WL 3924573 (D.D.C. Aug. 23, 2024) .............................. 18

*Media Matters for America v. Federal Trade Commission*,
    No. 25-1959, 2025 WL 2378009 (D.D.C. Aug. 15, 2025) ................................. 18

*Media Matters for America v. Federal Trade Commission*,
    No. 25-5302, 2025 WL 2988966 (D.C. Cir. Oct. 23, 2025) ............................... 18

*Media Matters for America v. Paxton*,
    138 F.4th 563 (D.C. Cir. 2025)......................................................................... 18

*Media Matters for Amerrica v. Paxton,*
    732 F.Supp.3d 1 (D.D.C. 2024) ............................................................................ 18

*Mendocino Environmental Center v. Mendocino County,*
    192 F.3d 1283 (9th Cir. 1999) ............................................................................. 17

*Mount Healthy City School District Board of Education v. Doyle,*
    429 U.S. 274 (1977).................................................................................... 15, 19

*O'Brien v. Welty,*
    818 F.3d 920 (9th Cir. 2016) ............................................................................. 15

*O'Connor v. City of Newark,*
    440 F.3d 125 (3rd Cir. 2006) ............................................................................. 18

*Oklahoma Press Publishing Co. v. Walling,*
    327 U.S. 186 (1946)........................................................................................... 13

*Peters v. United States,*
    853 F.2d 692 (9th Cir. 1988) ........................................................................ 9, 11

*Rodriguez v. Maricopa County Community College District,*
    605 F.3d 703 (9th Cir. 2010) ............................................................................. 17

*Roth v. United States,*
    354 U.S. 476 (1957)........................................................................................... 16

*Rutan v. Republican Party of Illinois,*
    497 U.S. 62 (1990).............................................................................................. 17

*Soranno's Gasco, Inc. v. Morgan,*
    874 F.2d 1310 (9th Cir. 1989) ........................................................................... 19

*Taggart v. U.S. Department of Justice,*
    No. 16-04040, 2017 WL 319062 (E.D. Penn. Jan. 20, 2017)............................. 18

*Turney v. Pugh,*
    400 F.3d 1197 (9th Cir. 2005) ........................................................................... 17

*United Mine Workers of America, District 12 v. Illinois State Bar Association,*
    389 U.S. 217 (1967)........................................................................................... 16

*United States v. Cruikshank,*
    92 U.S. 542 (1876)............................................................................................. 16

*United States v. Golden Valley Electric Association,*
    689 F.3d 1108 (9th Cir. 2012) ............................................................... 8, 9, 10, 13

*United States v. Minker*,
   350 U.S. 179 (1956) ........................................................................................... 9, 10

*United States v. Morton Salt Co.*,
   338 U.S. 632 (1950) ........................................................................................... 9, 13

*United States v. Multnomah County Department of Community Justice*,
   No. 6:25-CV-01784, 2025 WL 3267361 (D. Or. Nov. 24, 2025) ....................... 11

*United States v. Powell*,
   379 U.S. 48 (1964) ................................................................................................. 12

*United States v. Stevens*,
   559 U.S. 460 (2010) ............................................................................................... 17

*Virginia v. Black*,
   538 U.S. 343 (2003) ............................................................................................... 17

*Wearly v. Federal Trade Commission*,
   616 F.2d 662 (3d Cir. 1980) .................................................................................. 20

*White v. Lee*,
   227 F.3d 1214 (9th Cir. 2000) ................................................................. 16, 17, 18

**Rules**

Fed. R. Civ. P. 45 .......................................................................................................... 8

Fed. R. Civ. P. 81 .......................................................................................................... 8

**Regulations**

8 C.F.R. § 287.2 .......................................................................................................... 12

8 C.F.R. § 287.4 ....................................................................................... 5, 10, 11, 12

**Statutes**

8 U.S.C. § 1225 .................................................................................................... *passim*

18 U.S.C. § 2702 ........................................................................................................ 14

18 U.S.C. § 2703 ..................................................................................... 5, 9, 14, 15

18 U.S.C. § 2510 ........................................................................................................ 14

18 U.S.C. § 2711 ........................................................................................................ 14

**Other Authorities**

John Woodrow Cox, *He Supported the U.S. War in Afghanistan. Now He May Be Deported to the Taliban*, Washington Post (Oct. 14, 2025), https://www.washingtonpost.com/investigations/2025/10/14/trump-immigratio-afghanistan-asylum-deportation/ ................................................................................................................ 3

John Woodrow Cox, *ICE Indefinitely Holds Man Facing No Charges in High-Stakes Asylum Case*, Washington Post (Nov. 6, 2025), https://www.washingtonpost.com/investigations/2025/11/06/ice-indefinitely-holds-man-facing-no-charges-high-stakes-asylum-case/ ........................................................................ 4

John Woodrow Cox, *Trump Administration Makes Misleading Case in High-Stakes Asylum Hearing*, Washington Post (Oct. 30, 2025), https://www.washingtonpost.com/investigations/2025/10/30/trump-asylum-afghanistan-deport-immigration/ ..................................................................................................... 3, 4

Office of Inspector General, Department of Homeland Security, *Management Alert – CBP's Use of Examination and Summons Authority Under 19 U.S.C. § 1509* (2017), https://perma.cc/S6Y2-QK3Q .......................................................................................... 2

Order, *Doe/LBRRN v. U.S. Department of Homeland Security*, No. 3:25-mc-80288-AGT (N.D. Cal. Sept. 24, 2025), ECF 7 ........................................................................................ 2

Order, *In re Subpoena No. FY25-ELC-0105, Doe v. U.S. Department of Homeland Security*, No. 3:25-mc-80286-TSH (N.D. Cal. Sept. 19, 2025), ECF 4 ................................................ 2

Order, *In re Subpoena No. FY25-ELC-0105: Doe v. U.S. Department of Homeland Security*, No. 3:25-mc-80284-KAW (N.D. Ca., Oct. 1, 2025), ECF 9 .................................................... 2

Order, *In re Summons Nos. HSI-PH-2025-082814-001 & HSI-PH-2025-082819-001: Doe v. U.S. Department of Homeland Security*, No. 3:25-mc-80325-PHK (N.D. Cal. Oct. 17, 2025), ECF 3 ...................................................................................................................... 2, 8

Stipulation of Dismissal, *In re Subpoena No. FY25-ELC-0105, Doe v. U.S. Department of Homeland Security*, No. 3:25-mc-80286-TSH (N.D. Cal. Dec. 9, 2025), ECF 22 ..................... 2

*The Florida Bar,* Profile for Member No. 103274, https://perma.cc/WN74-BM93 ................... 5

U.S. Immigration and Customs Enforcement, *Who We Are*, https://www.ice.gov/about-ice/hsi .............. 7

**INTRODUCTION**

This motion challenges an administrative subpoena issued by the Department of Homeland Security without statutory authority and in retaliation for Movant's constitutionally protected speech criticizing DHS conduct that had been recently reported in the pages of the *Washington Post*.

On October 30, 2025, Movant Jon Doe ("Doe"), a U.S. citizen, read an article in the *Post* about "misleading" and "false" arguments advanced by DHS attorneys attempting to deport an Afghan asylum seeker. Doe read that the subject of the article had been evacuated from Afghanistan by the U.S. military in 2021 and fears persecution if returned based on his prior association with and support for U.S. forces. *See* Decl. of Jon Doe in Supp. of Mot. to Quash ("Doe Decl.") ¶ 4; Decl. of Jennifer Granick in Supp. of Mot. to Quash ("Granick Decl."), Ex B. The article named "the lead attorney for Homeland Security" in the case. Wishing to express his concern about the reported government misconduct, Doe did a simple Google search to find the DHS attorney's official DHS email address, which was posted publicly, and sent an email to that address expressing Doe's disagreement with the government's conduct. Doe's short email urged the DHS attorney to "[a]pply principles of common sense and decency" in the asylum seeker's case. *Id.* ¶¶ 6–8.

Within hours, DHS issued an "Immigration Enforcement Subpoena" (the "Subpoena") to Doe's email service provider, Google, seeking a variety of private information about Doe, his email account, and his use of Google's services. *Id.* ¶¶ 11–13, 23–24. Two and a half weeks later, federal agents and a uniformed police officer showed up at Doe's home and interrogated him about the email and the opinions he expressed on it, which were a matter of public concern. *Id.* ¶¶ 29–38. DHS issued the Subpoena under the purported authority of 8 U.S.C. § 1225(d), which empowers DHS to issue administrative subpoenas for records that are material and relevant to enforcement of certain immigration laws. 8 U.S.C. § 1225(d)(4). But writing to a government official to criticize arguments made by that official in open court is not an offense under the immigration laws, and it is firmly protected by the First Amendment's speech and petition clauses. The Subpoena is therefore unlawful. At the time of this filing, DHS has not withdrawn the Subpoena.

Doe now files this time-sensitive motion to prevent his protected information from being exposed to a government agency that is targeting him for doing nothing more than exercising his right to free

speech. The Subpoena should be quashed in its entirety. It exceeds both statutory and constitutional limits—each of which provides an independent basis to prohibit the Subpoena from compelling the disclosure of Doe's information to DHS.

This is far from the first time DHS has abused its administrative subpoena authority to target speech critical of the government. In September and October 2025, for example, DHS issued administrative subpoenas to Meta in an attempt to unmask anonymous social media accounts that have been critical of recent DHS actions, including the surge of indiscriminate and often brutal immigration raids. *See, e.g.*, *In re Subpoena No. FY25-ELC-0105, Doe v. U.S. Dep't of Homeland Sec.*, No. 3:25-mc-80286-TSH (N.D. Cal. stipulated dismissal Dec. 9, 2025); *In re Summons Nos. HSI-PH-2025-082814-001 & HSI-PH-2025-082819-001: Doe v. U.S. Dep't of Homeland Sec.*, No. 3:25-mc-80325-PHK (N.D. Cal. stipulated dismissal Jan. 28, 2026). Following motions to quash, magistrate judges in this district ordered Meta not to disclose the information requested by those administrative subpoenas.[1] DHS then withdrew them—including subpoenas the agency had issued under the same subpoena statute at issue here, Section 1225(d). *See, e.g.*, Stipulation of Dismissal, *Doe*, No. 3:25-mc-80286-TSH (N.D. Cal. Dec. 9, 2025), ECF 22. This follows earlier abuse of DHS's administrative subpoena authority, including use of a customs summons in 2017 to attempt to unmask the identity of an anonymous Twitter user who had posted material critical of the agency, which led to an Inspector General report identifying a pattern of "improper" use of such summonses and calling for reforms.[2]

The Court should immediately order Google not to provide any information in response to the subpoena, and order the Subpoena quashed after full briefing of this matter.

---

[1] Order, *Doe*, No. 3:25-mc-80286-TSH (N.D. Cal. Sept. 19, 2025), ECF 4; Order, *Doe*, No. 3:25-mc-80325-PHK (N.D. Cal. Oct. 17, 2025), ECF 3; Order, *In re Subpoena No. FY25-ELC-0105: Doe v. U.S. Dep't of Homeland Sec.*, No. 3:25-mc-80284-KAW (N.D. Ca., Oct. 1, 2025), ECF 9; Order, *Doe/LBRRN v. U.S. Dep't of Homeland Sec.*, No. 3:25-mc-80288-AGT (N.D. Cal. Sept. 24, 2025), ECF 7.

[2] Off. of Inspector Gen., Dep't of Homeland Sec., *Management Alert – CBP's Use of Examination and Summons Authority Under 19 U.S.C. § 1509*, at 2 (2017), https://perma.cc/S6Y2-QK3Q.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## STATEMENT OF FACTS

**I.    The *Washington Post* Articles and Public Concern Over Treatment of Afghan Asylum Seekers**

On October 14, 2025, the *Washington Post* published a story about the government's attempt to deport an Afghan asylum seeker, referred to as "H".[3] According to the *Post* article, H is among 200,000 Afghans who have sought refuge in the United States after the withdrawal of U.S. forces from Afghanistan in 2021.[4] After escaping Kabul on a U.S. military cargo plane in 2021, H was granted humanitarian parole in the United States and applied for asylum in 2022, fearing persecution by the Taliban on the basis of his prior cooperation with and public support for U.S. forces in Afghanistan.[5] Immigration and Customs Enforcement ("ICE") arrested H in July 2025, placed him in detention, and initiated deportation proceedings, despite federal records which show that his humanitarian parole had not yet expired at the time.[6]

On October 30, 2025, the *Washington Post* published a second article about H's case, revealing questionable conduct by government attorneys in H's immigration court proceedings and expanding on how H fears for his life if the U.S. government sends him back to Afghanistan under Taliban rule.[7] The *Post* reported that in seeking to deport H, DHS "did not accuse him of any crime or disloyalty or act of terrorism. Instead, attorneys argued that Afghanistan—a country U.S. forces rescued him from in 2021—is safe for his return."[8] However, as the *Post* reported:

> [H] has sought asylum because he so publicly supported the United States' cause in Afghanistan. Before fleeing, he worked for a U.S.-based nonprofit and attended an American university in Kabul.
>
> To undermine his claim, government attorneys argued that the Taliban have allowed those institutions to continue to operate—clear signs, they suggested, that his past would not endanger him if he was deported.

---

[3] John Woodrow Cox, *He Supported the U.S. War in Afghanistan. Now He May Be Deported to the Taliban*, Wash. Post (Oct. 14, 2025), https://www.washingtonpost.com/investigations/2025/10/14/trump-immigratio-afghanistan-asylum-deportation/, filed as Ex. A to the Granick Decl.

[4] *Id.*

[5] *Id.*

[6] *Id.*

[7] John Woodrow Cox, *Trump Administration Makes Misleading Case in High-Stakes Asylum Hearing*, Wash. Post (Oct. 30, 2025), https://www.washingtonpost.com/investigations/2025/10/30/trump-asylum-afghanistan-deport-immigration/, filed as Ex. B to the Granick Decl.

[8] *Id.*

Both institutions, however, have fundamentally transformed since H left them, The Post has found. The nonprofit's U.S. headquarters closed years before the country collapsed, and its former office in Afghanistan is now under strict Taliban supervision. The university, meanwhile, no longer provides in-person classes, and its campus was seized by the regime, which installed its own school.[9]

The *Post* article specifically named "[t]he lead attorney for Homeland Security, Joseph Dernbach," and quoted his questioning of H in immigration court about the continued existence of the nonprofit and the university.[10] "But the government overlooked or omitted . . . critical detail[s]," about how those institutions had changed.[11] Experts interviewed by the *Post* "dismissed the government's argument as false."[12]

The October 30 article generated intense public interest and outrage at the government's position in H's case. More than 1,200 readers have posted comments about the article on the *Washington Post* website.[13] As one reader put it in the comments section of the article, "[t]his is outrageously indefensible."[14] Another reader lamented: "As a retired US government employee who specialized in asylum and refugee law, I am appalled by the government's position and embarrassed by the government attorneys [sic] lack of reality."[15]

On November 6, 2025, the *Washington Post* published a third article about the developing case, again naming the lead DHS attorney seeking H's deportation, Joseph Dernbach, and discussing the government's litigation posture and its effect on H.[16]

## II.    Jon Doe's Email to a Government Official Regarding H's Case

Jon Doe is a resident of the greater Philadelphia area and a U.S. citizen. Doe Decl. ¶ 2. He cares deeply about international human rights and refugee issues. He volunteers with his synagogue's refugee committee, took a class about advocacy for immigrants, and occasionally contacts government

---

[9] *Id.*

[10] *Id.*; *see also* Doe Decl. ¶ 6.

[11] Cox, *supra* note 7 (Granick Decl. Ex. B).

[12] *Id.*

[13] Cox, *supra* note 7 (see "Comments" link at the bottom of the article); Granick Decl. ¶ 8.

[14] Granick Decl. ¶ 8.

[15] *Id.*

[16] John Woodrow Cox, *ICE Indefinitely Holds Man Facing No Charges in High-Stakes Asylum Case*, Wash. Post (Nov. 6, 2025), https://www.washingtonpost.com/investigations/2025/11/06/ice-indefinitely-holds-man-facing-no-charges-high-stakes-asylum-case/, filed as Ex. C to the Granick Decl.

representatives about these and other issues. *Id.* ¶ 3.

On the morning of October 30, 2025, Doe read that day's *Washington Post* article about H and was alarmed by the questionable conduct of government attorneys reported in the article. *Id.* ¶¶ 4–5. Doe wished to express his concerns and urge the government to take the threats to H's life seriously, so Doe endeavored to reach out to the government officials making the questionable arguments in the case. Doe noticed that the article named the "lead attorney for Homeland Security" in H's case, "Joseph Dernbach." *Id.* ¶¶ 5–6. Through a brief Google search, he found Dernbach's DHS email address, *Id.* ¶ 7, which is available on Dernbach's public profile on the Florida Bar website, along with his office address and phone number.[17] At 10:34 AM ET, Doe sent Dernbach an email from his personal Gmail account. The email subject line was "H" and the body of the email read, in full, as follows:

> Mr. Dernbach, don't play Russian roulette with H's life. Err on the side of caution. There's a reason the US government along with many other governments don't recognize the Taliban. Apply principles of common sense and decency.

Doe Decl. ¶ 8; Doe Decl. Ex. A. Doe signed the email with his first and last name. Doe Decl. ¶ 9. Doe made no other outreach to Dernbach or any other representative of DHS about the matter until after the issuance of the administrative subpoena, which happened just a few hours later. *Id.* ¶ 10.

### III.    The Subpoena and Google's Response

On October 30, 2025, at 2:37 PM ET, approximately four hours after Doe sent his email to Dernbach, DHS issued an administrative "Immigration Enforcement Subpoena" to Google, citing 8 U.S.C. § 1225(d) and 8 C.F.R § 287.4. Doe Decl. Ex. E. The Subpoena states that production of certain records "is required in connection with an investigation or inquiry relating to the enforcement of U.S. immigration laws." *Id.* The Subpoena does not, however, identify the connection such "investigation" could have to Doe, a U.S. citizen with no ties to H's immigration case. Nowhere in the Subpoena does the agency cite any actual or potential crime or other violation of law, immigration or otherwise. The Subpoena seeks information from Doe's personal Gmail account, including his name, address, a record of session times and IP addresses, types of services utilized, credit card and bank account numbers, social security number, driver's license numbers, and other private information.[18] *Id.* Doe received no notice of

---

[17] *The Fla. Bar,* Profile for Member No. 103274, https://perma.cc/WN74-BM93. *See also* Granick Decl. ¶¶ 10–11; Granick Decl. Exs. D & E.

[18] As explained below, *infra* Part I.C, while the Stored Communications Act, 18 U.S.C. §

the subpoena from DHS.

At 3:45 PM ET the same day, Google notified Doe by email that the company had received legal process from DHS. Doe Decl. ¶¶ 11–14; Doe Decl. Ex. B.[19] The company did not provide a copy of the Subpoena, but advised Doe that he had only seven days to challenge the demand in court with a motion to quash. Doe Decl. ¶¶ 15–16; Doe Decl. Ex. C. Google's notification email came from a "no-reply" address and directed Doe to contact DHS for more information regarding the case, but did not provide any contact information for the agency. Doe Decl. ¶ 14; Doe Decl. Ex. B. Doe was shocked and confused as to why the federal government was investigating him, and he was fearful about why the government would be targeting him and his information and what would happen if the government accessed his personal information. Doe Decl. ¶¶ 18, 39–44. He did not understand the legal process, did not have the financial means to pay for legal representation, and was left without any way to contact either Google or DHS. *Id.* ¶ 19. He searched the Internet for DHS contact information to follow up with the agency as Google advised, but the phone numbers listed were no longer in operation or were for entirely irrelevant purposes. *Id.* ¶ 20.

Doe reached out to nonprofit legal organizations for support, and eventually obtained a new contact address for Google. *Id.* ¶ 21. On November 21, 2025, Doe wrote to this new Google address and requested a copy of the Subpoena, at which point the company sent him a copy of the legal process and the company's transparency report, and once again directed Doe to contact DHS for additional information regarding the case. *Id.* ¶ 22–24; Doe Decl. Exs. D & E. On November 24, 2025, Google informed Doe that it had not yet responded to the Subpoena. Doe Decl. ¶ 26. Doe followed up with Google on November 27, 2025, and again on December 2, 2025, asking the company to not disclose his information to DHS without a court order. *Id.* ¶¶ 27–28; Doe Decl. Ex. F. Once Doe secured representation from the ACLU, his counsel contacted Google to seek further information. On December 8, 2025, Google confirmed that it had not yet produced any records to DHS in response to the Subpoena.

---

2703(c)(2), allows government access to basic subscriber information with a subpoena, this subpoena seeks information beyond the permissible categories, such as alternate email addresses and screen names, date of birth, social security number, and driver's license number. See Doe Decl. Ex. E, at 3.

[19] Google's notification to Doe included an error. The notification to Doe listed the subpoena issuance date as October 29, 2025, however the subpoena was dated October 30, 2025. *See* Doe Decl. ¶ 25.

1  Granick Decl. ¶ 12. Google has not revealed documents or information pursuant to the subpoena in

2  accordance with its policy when notified that a user intends to move to quash. *Id.*

3  **IV.    DHS Agents' Appearance at Doe's Home Address**

4        Doe resides in a quiet suburban town with his spouse. Doe Decl. ¶ 29. On November 17, 2025, at

5  around 9:30AM ET, Doe heard a knock on the door and observed two vehicles parked outside—a local

6  police vehicle and an unmarked sedan. *Id.* ¶ 30. There were two individuals in plain clothes and a

7  uniformed police officer on Doe's porch. *Id.* ¶ 31. Doe and his spouse stepped outside, and the plain-

8  clothed individuals introduced themselves as agents of Homeland Security Investigations ("HSI").[20] *Id.*

9  Doe asked to see identification and the agents showed Doe their badges. The agents asked Doe to identify

10 himself, which he did. *Id.* ¶ 32. Doe's spouse went inside the house with the police officer, while the DHS

11 agents proceeded to question Doe. *Id.* ¶ 33.

12       Doe was panicked, scared, and embarrassed, but tried to remain calm and answer the agents'

13 questions. *Id.* ¶ 34. One of the agents pulled up on his phone the email that Doe had written to Dernbach

14 on October 30, 2025, and asked if he had written the email. *Id.* ¶ 35. After Doe confirmed that he had, the

15 agent pressed Doe to explain it. *Id.* Doe explained that he wrote the email in response to the *Washington

16 Post* article, and that it was simply an opinion based on the circumstances of H's case. Doe recounted his

17 concerns, specifically that H had taken risks to support the U.S. mission in Afghanistan by assisting

18 American forces and speaking out against the Taliban. Doe explained that he found it unconscionable that

19 H had lost his humanitarian parole status under the Trump administration even though he faced execution

20 upon deportation to Afghanistan. Doe told the agents that the fact that the United States does not recognize

21 the legitimacy of the Taliban regime speaks volumes about how dangerous it would be for H to return.

22 Doe also told the agents that that "this is no way to help those who helped us." *Id.*

23       Doe was frightened by this interrogation outside his home. *Id.* ¶ 39. After twenty minutes of

24 questioning about the email, the agents told him they were done speaking with him, but remained in front

25 of his home speaking with the local police officer for an extended period of time afterwards. *Id.* ¶ 38.

26       Doe was shocked and deeply troubled that the federal government pursued him at his home for

27 nothing more than exercising his First Amendment rights with an innocuous and polite email. *Id.* ¶ 39.

28

---

[20] HSI is a component of Immigration and Customs Enforcement, within the Department of Homeland
Security. *See* U.S. Immigr. & Customs Enf't, *Who We Are*, https://www.ice.gov/about-ice/hsi.

As a result of the escalating investigative actions against him, which have been inexplicably cloaked in secrecy, Doe has been panicked and concerned for his safety and freedom. *Id.* ¶¶ 39–44. Even after DHS identified Doe's personal information, pursued and intimidated him at his home address, and questioned him about the email he wrote to Dernbach, the agency has not withdrawn the Subpoena.

## JURISDICTION

Under Rule 45(d)(3)(A) of the Federal Rules of Civil Procedure, "the court for the district where compliance is required must quash or modify a subpoena" that requires disclosure of protected matter or subjects a person to undue burden. The procedures under Rule 45 are made applicable to the federal administrative subpoena at issue here pursuant to Rule 81(a)(5), which provides that the Federal Rules of Civil Procedure "apply to proceedings to compel testimony or the production of documents through a subpoena issued by a United States officer or agency under a federal statute, except as otherwise provided by statute, by local rule, or by court order in the proceedings." This district is a proper venue for Movant to file this motion because Google is located in this district and has been requested to transmit responsive information from this district.

"Concomitant with the Court's discretion to manage discovery, courts have inherent authority and discretion to stay compliance with a subpoena (or administrative summons subject to Rule 45 via Rule 81) pending resolution of a motion testing that subpoena." Order at 2, *Doe v. U.S. Dep't of Homeland Sec.*, No. 25-mc-80325-PHK (N.D. Cal. Oct. 17, 2025), ECF No. 3 (citing *Harris v. United States*, 413 F.2d 314, 315 (9th Cir. 1969)).

## SUMMARY OF ARGUMENT

DHS's administrative subpoena in this case fails on both statutory and constitutional grounds. It is axiomatic that, as a matter of both statutory interpretation and the Fourth Amendment, an administrative subpoena may only seek records relevant to an investigation authorized by Congress in the pertinent subpoena statute. *See United States v. Golden Valley Elec. Ass'n*, 689 F.3d 1108, 1113 (9th Cir. 2012). Here, the relevant statute, Section 1225(d), provides DHS with limited authority to issue subpoenas in service of investigations concerning enforcement of the Immigration and Nationality Act ("INA")—in other words, immigration enforcement investigations. Regardless of how one interprets the scope of Section 1225(d), sending an email to a DHS official criticizing the government's conduct in an immigration

case is not even arguably illegal, nor is it potentially relevant to the enforcement of the INA. Moreover, because the Subpoena was issued for the illegitimate purpose of retaliating against Doe's First Amendment-protected speech, it cannot stand. The Subpoena seeking Doe's records from Google is thus unlawful.

The Subpoena should also be quashed because it strikes directly at constitutionally protected speech and petitioning. Writing to government officials on a matter of public concern, as Doe did here, is a core exercise of these rights. The Subpoena constitutes unconstitutional retaliation under the First Amendment. The Subpoena's retaliatory motivation is undeniable: First, because DHS issued the Subpoena only hours after Doe sent the email in question. And second, because two weeks later DHS sent two agents and a police officer to Doe's home to question him about the email. The Subpoena and the interrogation by federal agents have had a chilling effect on Doe's expression to government officials.

The Subpoena also violates the Stored Communications Act ("SCA"), 18 U.S.C. § 2703, which prohibits electronic communication service providers like Google from disclosing customer records to the government pursuant to an administrative subpoena unless that subpoena is "authorized by a Federal or State statute," *id.* § 2703(c)(2), which this Subpoena is not. Moreover, the Subpoena seeks information, including Doe's social security number, date of birth, and driver's license number, that is beyond the narrow categories of basic subscriber information that the government can demand pursuant to an administrative subpoena at all. *Compare* 18 U.S.C. § 2703(c)(2), *with* Doe Decl. Ex. E (Subpoena).

## ARGUMENT

### I.    The Subpoena Must Be Quashed Because it Exceeds DHS's Statutory Authority and Violates the Fourth Amendment.

DHS is not authorized to issue subpoenas for the purpose of investigating email messages from members of the public criticizing the government's arguments in immigration court. An administrative subpoena is improper if it seeks records beyond the scope of an investigation authorized by the enabling statute. *Golden Valley Elec. Ass'n*, 689 F.3d at 1113; *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950) (a subpoena is permissible only if "the inquiry is within the authority of the agency"). Courts should not imply a power to issue an administrative subpoena for investigations not authorized by Congress with "sufficient clarity" in the administrative subpoena statute itself. *United States v. Minker*, 350 U.S. 179, 190 (1956); *see also Peters v. United States*, 853 F.2d 692, 699 (9th Cir. 1988). An

administrative subpoena likewise cannot seek records to see whether they "may reveal other wrongdoing, as yet unknown" when there is "no statutory authority to support this unlimited claim of investigatory power." *In re Sealed Case (Admin. Subpoena)*, 42 F.3d 1412, 1415, 1418–19 (D.C. Cir. 1994).

Neither of the two possible sources of authority cited in the Subpoena—8 U.S.C. § 1225(d) and 8 C.F.R. § 287.4—permit DHS to issue a subpoena in service of investigating an email sent to a publicly identified government employee addressing a matter of public concern. To permit DHS to move forward with the Subpoena would be outside the scope of the agency's permissible powers.

Administrative subpoenas must also satisfy the "Fourth Amendment reasonableness inquiry." *Golden Valley Elec. Ass'n*, 689 F.3d at 1113 (cleaned up). As to subpoenas, the Fourth Amendment requires at least that "the inquiry is within the authority of the agency, the demand is not too indefinite[,] [ ] the information sought is reasonably relevant" and not "overbroad or unduly burdensome," *id.* at 1115 (citations omitted), and that it is not sought for an "illegitimate purpose." *McLane Co. v. E.E.O.C.*, 581 U.S. 72, 77 (2017) (citation omitted). The Subpoena fails these requirements too.

A.    **Investigating a Non-Threatening Email Sent by a Member of the Public to a Government Employee Is Outside the Authority of 8 U.S.C. § 1225(d) and 8 C.F.R. § 287.4.**

The facts here establish that DHS issued the Subpoena to target Doe for sending an innocuous email to Dernbach, a public official, expressing an opinion on an issue of public concern. The Subpoena was issued the same day that Dernbach received Doe's email, and it seeks a wide array of private information about the holder of the transmitting email account. And the agents who later interrogated Doe at his home brought up the email explicitly and they asked him about nothing else.

The Subpoena cites 8 U.S.C. § 1225(d), but that statute does not authorize DHS to issue a subpoena in connection with emails to a public official. Section 1225(d) authorizes immigration officers to issue subpoenas "relating to the privilege of any person to enter, reenter, reside in, or pass through the United States or concerning any matter which is material and relevant to the enforcement of this chapter and the administration of the Service." 8 U.S.C. § 1225(d)(4)(A). The "chapter" referenced is Chapter 12 of Title 8,[21] which has five Subchapters:

---

[21] When a subpoena statute refers to a subdivision of the U.S. Code, the statute must be literally construed to permit issuance of subpoenas to investigate only matters addressed within that subdivision. *See Minker*, 350 U.S. at 185–86 ("Throughout this statute the word 'Act' is given its full significance. The word

- Subchapter I—General Provisions (definitions and powers of officials);
- Subchapter II—Immigration (who may enter, the allocation and issuance of visas, admission of refugees, and the asylum process);
- Subchapter III—Nationality and Naturalization (how a person may be deemed a citizen as well as how citizenship may be lost);
- Subchapter IV—Refugee Assistance (appropriations for helping refugees);
- Subchapter V—Alien Terrorist Removal Procedures (process for removing those designated as an "alien terrorist")

These subchapters, which are generally known as the Immigration and Nationality Act, provide authority to engage in various kinds of immigration enforcement. *See, e.g.*, *United States v. Multnomah Cnty. Dep't of Cmty. Just.*, No. 6:25-CV-01784, 2025 WL 3267361, at *3 (D. Or. Nov. 24, 2025) (Section 1225 provides a "grant of subpoena power over 'any matter which is material and relevant to' immigration enforcement." (quoting 8 U.S.C. § 1225(d)(4)(A))). Chapter 12 does not provide authority for DHS to investigate expressions of opinion or petitions to government officials.

The face of the Subpoena also makes clear that its scope is limited to investigations related to immigration enforcement. The Subpoena is captioned "IMMIGRATION ENFORCEMENT SUBPOENA," and it directs that "production of the indicated records is required in connection with an investigation or inquiry *relating to the enforcement of U.S. immigration laws*."[22] Doe Decl. Ex. E at 2 (emphasis added). The power to issue subpoenas is explicitly constrained to the scope of the Chapter, yet neither the Subpoena, nor the facts and circumstances surrounding its issuance, nor the questioning by DHS agents conducted at Doe's home suggest that it seeks records pertinent to an immigration enforcement investigation. To the contrary, DHS is targeting and interrogating a U.S. citizen for expressing an opinion about the government's publicly reported activities.

Nor does 8 C.F.R. § 287.4 authorize this Subpoena. The authority to issue subpoenas under Section 1225(d) is "created solely by statute," not by regulation. *Peters,* 853 F.2d at 696 (citation omitted). The regulation, 8 C.F.R. § 287.4, is not a substantive grant of subpoena authority, but rather a designation of

---

embraces the entire statute. On the other hand, when only a particular title is referred to, it is designated as such, and when the reference is to a section, that word is employed." (footnotes omitted)).

[22] The Subpoena is issued on a standard agency form (DHS Form I-138), consisting of this and other template language, with spaces for addition of case-specific details identifying the subject of the investigation, the records sought, and instructions regarding the return of responsive records. Doe Decl. Ex. E; *see also* 8 C.F.R. § 287.4(b) ("All subpoenas shall be issued on Form I–138."). The standard form language regarding the immigration enforcement purpose of Section 1225(d) subpoenas reflects DHS's recognition that the authority for subpoenas issued under that statute is limited.

1   which government employees may issue subpoenas, *id.* § 287.4(a), what form subpoenas must take, *id.* §

2   287.4(b), how subpoenas may be served, *id.* § 287.4(c), and how the agency may invoke the aid of a court

3   in seeking enforcement of a subpoena after a recipient neglects or refuses to comply, *id.* § 287.4(d).

4   Nothing in the regulation purports to expand the substantive authority granted by Congress in Section

5   1225, nor could it.

6        The government may point to language in the regulation specifying that certain immigration

7   officers "may issue a subpoena requiring the production of records and evidence for use in criminal or

8   civil investigations." 8 C.F.R. § 287.4(a)(1). But that language addresses how records properly obtained

9   under the relevant subpoena statute may be *used*. It does not and cannot expand the purposes for which

10  they can be sought. Further, those "criminal or civil investigations" cannot (and do not) encompass all

11  violations of criminal and civil law; rather, they encompass only those criminal and civil violations that

12  the officers are empowered to investigate pursuant to the enabling statute, Section 1225(d). *See also* 8

13  C.F.R. § 287.2 (allowing agents with "reason to believe that there has been a violation punishable under

14  any criminal provision of the immigration and nationality laws administered or enforced by the

15  Department" to open an investigation). Since DHS is not empowered to investigate the sending of emails

16  expressing opinions about immigration cases in the news, this regulation cannot justify the Subpoena,

17  either.

18        **B.    The Subpoena Seeks Records for an Illegitimate Purpose, and These Records Are
          Not "Material and Relevant" to Any Permissible Investigation.**

19

20        A subpoena cannot be enforced unless the government demonstrates that the "investigation will

21  be conducted pursuant to a legitimate purpose." *United States v. Powell*, 379 U.S. 48, 57 (1964). When a

22  subpoena is issued for an "improper purpose, such as to harass the [individual] . . . or for any other purpose

23  reflecting on the [lack of] good faith of the particular investigation," it cannot stand. *Id.* at 58. Here, the

24  government issued the subpoena for a plainly "illegitimate purpose"—to uncover information about Doe

25  and send agents to his home for an interrogation *because* he wrote to a government official and to punish

26  him for it and deter future similar communication. *McLane Co.*, 581 U.S. at 77 (citation omitted). The

27  government's illegitimate purpose is demonstrated by the issuance of the Subpoena mere hours after Doe

28  wrote his email and by the DHS agents' own demonstration to Doe that their visit was prompted by Doe's

email. But it is not even arguably unlawful to write to a government official about a matter of public

1    concern, nor could the substance of Doe's email point to any other unlawful conduct. As discussed below,

2    *infra* Part II.A, the First Amendment protects the content of Doe's email and his communication to a

3    government official, which does not constitute speech falling within any of its narrowly circumscribed

4    exceptions. The government therefore had no legitimate investigative purpose in seeking any information

5    at all about Doe from Google.

6          In addition, the statute at issue, Section 1225(d), permits subpoenas only for records that are

7    "*material and relevant* to the enforcement of this chapter and the administration of the Service." 8 U.S.C. §

8    1225(d)(4)(A) (emphasis added). This is both a statutory requirement and a limitation imposed by the

9    Fourth Amendment, which requires that administrative subpoenas seek only information "reasonably

10   relevant" to an investigation within the agency's power. *Morton Salt Co.*, 338 U.S. at 652; *accord Golden*

11   *Valley Elec. Ass'n*, 689 F.3d at 1113 ("The critical questions [include] . . . whether the evidence is relevant

12   and material to the investigation."). As explained above, the Subpoena seeks records not related to

13   "enforcement of this chapter"—i.e., immigration enforcement. Thus, the "evidence sought by the

14   subpoena is . . . irrelevant to any lawful purpose of the agency," rendering the Subpoena wholly invalid.

15   *Golden Valley Elec. Ass'n*, 689 F.3d at 1113–14.

16         But even if that were not so, the Subpoena would still be impermissible because it seeks records

17   not relevant to the scope of the government's investigation. The Subpoena requests production of a wide

18   set of records, including not only Doe's name and address, but also "Records of all available session

19   times, dates, and duration," "Length of service (including start date) and types of services utilized," "Any

20   subscriber number or identity, including . . . social security numbers," and "Means and source of payment

21   (including any credit card or bank account numbers)." Doe Decl. Ex. E at 3. And it seeks such records

22   covering the period of September 1, 2025, "to the present." *Id*. Yet, the investigation involves a single

23   email sent by Doe on the morning of October 30, 2025, in response to a newspaper article published that

24   same morning, with no reason to believe earlier records would be relevant. Information such as how long

25   he had maintained a Gmail account and what other Google services he uses, his bank and credit card

26   details, and a full log reflecting his use of Google's services over a two-month period, were plainly

27   irrelevant, and thus "excessive[] for the purposes of the relevant inquiry." *Golden Valley Elec. Ass'n*, 689

28   F.3d at 1115 (quoting *Okla. Press Publ'g Co. v. Walling,* 327 U.S. 186, 209 (1946)).

---

## C.    The Subpoena Violates the Electronic Communications Privacy Act, 18 U.S.C. § 2703.

Because the Subpoena is not authorized by statute, Google is prohibited from sharing the information sought under the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2703. ECPA—and in particular Title II of the ECPA, known as the Stored Communications Act ("SCA")—provides the means through which a governmental entity may require a provider of electronic communication service ("ECS") to disclose a record or other information pertaining to a subscriber or customer of such service. Google has users and provides them the ability to send and receive electronic communications. *See* 18 U.S.C. § 2510(12), (15) (relevant definitions); *id.* § 2711(1) (incorporating by reference the definitions in Section 2510). Google is therefore a provider of an ECS within the meaning of the SCA. *See In re Google Inc.*, No. 13-MD-02430-LHK, 2013 WL 5423918, at *8 (N.D. Cal. Sept. 26, 2013) ("Google provides the electronic communication service at issue here, Gmail."). Doe is a user of such service. *See* 18 U.S.C. § 2510(13).

Section 2703(c)(2) specifies the categories of information that a governmental entity may obtain from an ECS without a search warrant or court order. The only ECS information that may be obtained with an administrative subpoena is:

> (A) name;
>
> (B) address;
>
> (C) local and long distance telephone connection records, or records of session times and durations;
>
> (D) length of service (including start date) and types of service utilized;
>
> (E) telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address; and
>
> (F) means and source of payment for such service (including any credit card or bank account number).

18 U.S.C. § 2703(c)(2). The SCA allows the government to obtain this information "when the governmental entity uses an administrative subpoena *authorized by a Federal or State statute* or a Federal or State grand jury or trial subpoena." *Id.* (emphasis added). As explained above, the administrative subpoena in this case is not authorized by statute, because it exceeds the permissible scope of 8 U.S.C. § 1225. It therefore violates the SCA, and thus the government's Subpoena may not compel Google to disclose this subscriber information. *See* 18 U.S.C. § 2702(a)(3), (c) (prohibiting a provider of electronic communication service to the public from "divulg[ing] a record or other information pertaining to a

subscriber to or customer of such service . . . to any governmental entity," except pursuant to legal process authorized by Section 2703, or a statutory exception not at issue here).

In addition, the Subpoena seeks categories of "information pertaining to a subscriber" that are protected by the SCA, *see* 18 U.S.C. § 2703(c)(1), but are not listed in section 2703(c)(2) and are thus unobtainable with an administrative subpoena. *See In re AT&T Non-Disclosure Ord.*, No. 25-MR-1769, 2025 WL 3079326, at *4 (D.N.M. Nov. 4, 2025) ("If the government wants to use a subpoena to obtain non-content Subscriber Information about a subscriber, the government must either have the subscriber's consent, 18 U.S.C. § 2703(b)(1)(B)(i), or it must limit its request to the Basic Subscriber Information permitted by Section 2703(c)(2)."). These requested categories that are not listed in Section 2703(c)(2) include "alternate email addresses," "alternate user names," "dates of birth," "social security numbers," and "drivers' license numbers." Doe Decl Ex. E at 3. This is an independent reason that the Subpoena exceeds the permissible scope of the SCA.

## II.    The Subpoena Also Must be Quashed Because It Was Issued to Retaliate against Doe's First Amendment-Protected Speech.

"Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right,' and the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (alteration in original) (quoting *Crawford-El v. Britton*, 523 U.S. 574, 588 n.10 (1998)). To demonstrate First Amendment retaliation, Doe must show that: "(1) he was engaged in a constitutionally protected activity; (2) the [government's] actions would chill a person of ordinary firmness from continuing to engage in the protected activity and (3) the protected activity was a substantial or motivating factor in the [government's] conduct." *Bello-Reyes v. Gaynor*, 985 F.3d 696, 700 (9th Cir. 2021) (quoting *O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016)); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283–84, 287 (1977). Doe readily meets these elements. And the government cannot show that it would have issued the subpoena even absent Doe's protected speech. *Mt. Healthy*, 429 U.S. at 287; *Bello-Reyes*, 985 F.3d at 702 ("[O]nce a petitioner has made a showing of a First Amendment retaliation claim, 'the burden shifts to the government to show that it would have taken the same action even in the absence of the protected conduct." (internal quotation marks omitted) (quoting *O'Brien*, 818 F.3d at 932)).

**A.      The First Amendment Protects Doe's Email to a Government Official About a Matter of Public Concern.**

Doe's email to a government official on a matter of public concern is protected by the First Amendment's rights of petition and free speech. These rights work together to ensure that people can "express their ideas, hopes, and concerns to their government" and "foster[] the public exchange of ideas that is integral to deliberative democracy." *Borough of Duryea. v. Guarnieri*, 564 U.S. 379, 388 (2011); *see also Roth v. United States*, 354 U.S. 476, 484 (1957) ("The protection given speech . . . was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people."). Both rights "are integral to the democratic process." *Guarnieri*, 564 U.S. at 388. The right to petition, in particular, is "implied by '[t]he very idea of a government, republican in form.'" *BE & K Constr. Co. v. N.L.R.B.*, 536 U.S. 516, 524–25 (2002) (alteration in original) (quoting *United States v. Cruikshank*, 92 U.S. 542, 552 (1876)); *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 612 (1972) ("Certainly the right to petition extends to all departments of the Government."); *see also United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n*, 389 U.S. 217, 222 (1967) (right to petition is "among the most precious of the liberties safeguarded by the Bill of Rights").

Writing to government officials on a matter of public concern, as Doe did here, is a core exercise of the rights of petition and free speech. *See White v. Lee*, 227 F.3d 1214, 1221, 1227 (9th Cir. 2000) (plaintiffs exercised right to petition including by writing letters to city council opposing permit to convert motel to housing for unhoused persons); *Evers v. Custer Cnty.*, 745 F.2d 1196, 1204 (9th Cir. 1984) (writing letter to government officials "falls within the first amendment's protection of the right to petition the government for redress of grievances"); *see also McDonald v. Smith*, 472 U.S. 479, 486 (1985) ("[E]xercise of the right to petition 'may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials' . . . .") (Brennan, J., concurring) (citation omitted); *E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 138 (1961) (Sherman Act did not apply where railroads "solicit[ed] . . . government action with respect to the passage and enforcement of laws"). Doe's email raises a matter of profound public concern—the government's attempts to deport an Afghan asylum seeker who fears the Taliban will kill him because of his prior cooperation with U.S. forces in Afghanistan. Upon reading about the government's efforts in the *Washington Post*, Doe expressed his opposition to the government's position by emailing Dernbach at his official government email address

1   and simply urging him to protect the asylum seeker. Indeed, the only difference between Doe and the

2   many hundreds of people who offered similarly outraged opinions about the government's conduct in the

3   comments section of the *Washington Post* was that Doe sent his thoughts directly to the responsible

4   government official via a publicly available official email address.

5   The content of Doe's email does not plausibly fall within one of the narrow exceptions to the First

6   Amendment. It was neither harassment, *Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*, 605 F.3d 703,

7   710 (9th Cir. 2010) ("Harassment law generally targets conduct, and it sweeps in speech as harassment

8   only when consistent with the First Amendment."), nor speech integral to criminal conduct such as

9   obstruction, *Bridges v. California*, 314 U.S. 252, 262, 273, 277 (1941) (telegram to government official

10  about pending litigation was exercise of right to petition and could only be restricted if it presented a clear

11  and present danger to administration of justice),[23] nor a "true threat", *Counterman v. Colorado*, 600 U.S.

12  66, 69, 75 (2023) ("'serious expression[s]' conveying that a speaker means to 'commit an act of unlawful

13  violence'" (quoting *Virginia v. Black*, 538 U.S. 343, 359 (2003)), nor any other speech fitting into the

14  discrete categories that the Supreme Court has exempted from First Amendment protection, *see, e.g.*,

15  *United States v. Stevens*, 559 U.S. 460, 468–69 (2010) (listing obscenity, defamation, fraud, incitement,

16  and speech integral to criminal conduct as categories of unprotected expression).

17  **B.    The Government Retaliated.**

18  The government's Subpoena to Google for Doe's account information constitutes a retaliatory

19  adverse action, made all the more chilling when agents showed up at his door to interrogate him about his

20  email and opinions on a matter of public concern. It is more than sufficient to "chill or silence a person

21  of ordinary firmness from future First Amendment activities." *Mendocino Env'tl Ctr. v. Mendocino Cnty.*,

22  192 F.3d 1283, 1300 (9th Cir. 1999) (citation omitted). As a general matter, "[i]nformal measures, such

23  as 'the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation,' can

24  violate the First Amendment." *White*, 227 F.3d at 1228; *Rutan v. Republican Party of Ill.*, 497 U.S. 62,

25  76 n.8 (1990) ("[T]he First Amendment . . . protects . . . from even an act of retaliation as trivial as failing

---

[23] The Ninth Circuit has recognized that "[i]n light of the subsequent evolution of the clear and present danger test, it can be extrapolated that, as a general rule, speech concerning judicial proceedings may be restricted only if it 'is directed to inciting or producing' a threat to the administration of justice that is both 'imminent' and 'likely' to materialize." *Turney v. Pugh*, 400 F.3d 1197, 1202 (9th Cir. 2005) (quoting *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (per curiam)).

to hold a birthday party for a public employee . . . when intended to punish her for exercising her free speech rights." (citation and internal quotation marks omitted)); *Kando v. City of Long Beach*, No. 21-56199, 2023 WL 3092304, at *1 (9th Cir. Apr. 26, 2023) (government official "threat to sue" was adverse action); *O'Connor v. City of Newark*, 440 F.3d 125, 128 (3rd Cir. 2006) (threshold for First Amendment retaliation action "supplied by all but truly de minimis violations").

Courts around the country have found that subpoenas, and other investigative actions such as showing up at someone's home and interrogating them, meet the adverse action standard for First Amendment retaliation. *White*, 227 F.3d at 1228–29 (investigation including directing individuals under threat of subpoena to produce information was adverse action); *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 917 (9th Cir. 2012) (en banc) (government actions including "broad, invalid subpoenas" were adverse); *Media Matters for Am. v. Fed. Trade Comm'n*, No. 25-1959, 2025 WL 2378009, at *15 (D.D.C. Aug. 15, 2025); *aff'd*, No. 25-5302, 2025 WL 2988966 (D.C. Cir. Oct. 23, 2025) (civil investigative demand was adverse action); *Media Matters for Am. v. Paxton*, 732 F.Supp.3d 1, 8 (D.D.C. 2024), *aff'd*, 138 F.4th 563 (D.C. Cir. 2025) (same); *Media Matters for Am. v. Bailey*, No. 24-cv-147, 2024 WL 3924573, at *11 (D.D.C. Aug. 23, 2024) (same); *Taggart v. U.S. Dep't of Just.*, No. 16-04040, 2017 WL 319062 (E.D. Penn. Jan. 20, 2017) (same).

"While a plaintiff's actual response to a defendant's conduct is not dispositive, it provides some evidence of the tendency of that conduct to chill First Amendment activity." *Media Matters for Am.*, 2025 WL 2378009, at *16 (cleaned up). Doe has demonstrated that the Subpoena actually chilled his protected speech and petitioning activity. He is hesitant to initiate First Amendment-protected contact with government officials again, and he experiences fear and anxiety when he contemplates other protected advocacy, directly as a result of this Subpoena. Doe Decl. ¶¶ 39–44.

That the Subpoena was issued to a third party, Google, heightens both objective and subjective chill. Doe has no control over and no insight into whether Google would comply with the demand. Indeed, when Google informed Doe that it had received the Subpoena, it advised him via a "no-reply" address that he had only seven days to challenge the demand in court with a motion to quash and, despite directing Doe to contact DHS, provided no contact information for the agency. *Id.* ¶¶ 11–17; Doe Decl. Exs. B & C. DHS itself provided no process to Doe and despite Doe's best efforts, he could reach no one at the

1  agency to discuss the Subpoena. Doe Decl. ¶ 20. Doe ultimately had to seek assistance from nonprofit

2  legal organizations in order to obtain a copy of the Subpoena from Google. *Id.* ¶ 21. And it is through

3  counsel that Doe has received confirmation from Google that it does not intend to comply with the

4  Subpoena before a judicial ruling in this matter, but in the absence of a court order directing

5  noncompliance, Google reserves the right to comply. Granick Decl. ¶ 12.

6        **C.  Doe's Speech Was a Substantial Motivating Factor.**

7        Doe need only show that his protected expression was a substantial or motivating factor behind

8  the government's retaliatory action. *See Mt. Healthy*, 429 U.S. at 287; *Soranno's Gasco, Inc. v. Morgan*,

9  874 F.2d 1310, 1314 (9th Cir. 1989); *see also Lacey*, 693 F.3d at 916 (applying *Mt. Healthy* "substantial

10  or motivating factor" standard to alleged retaliatory investigation, including use of subpoenas). The

11  evidence here demonstrates that Doe's protected expression was the government's primary, if not sole,

12  motivation. The DHS agents who visited Doe at home and interrogated Doe asked him exclusively about

13  the email, demonstrating that was the reason for their visit and investigation into Doe. Doe Decl. ¶¶ 35–

14  36. One of the agents took out his phone and showed Doe the email Doe had written to Dernbach on

15  October 30, asked him if he had written it, and pressed him to explain it. *Id.*

16        The circumstances under which DHS issued the Subpoena further demonstrate that Doe's email

17  was the motivating factor behind the investigation. "In assessing whether this causal element is met, courts

18  have . . . given weight to circumstantial evidence such as proximity in time between the protected speech

19  and the adverse action . . . and evidence that the defendant proffered false or pretextual explanations for

20  the adverse action." *Boquist v. Courtney*, 32 F.4th 764, 777 (9th Cir. 2022). Here, the "proof is clearly

21  found" in the government's issuance of the subpoena just a few hours after Doe sent his email to

22  Dernbach. *Lacey*, 693 F.3d at 917 (citing *Bruce v. Ylst*, 351 F.3d 1283, 1288–89 (9th Cir. 2003) (proximity

23  in time supports inference motive was unconstitutional retaliation)); *Kando*, 2023 WL 3082304, at *1–*2

24  (evidence of causation demonstrated where government "made the threat in direct response" to protected

25  expression); *CarePartners, LLC v. Lashway*, 545 F.3d 867, 878 (9th Cir. 2008) (timing of adverse action

26  "suspiciously close in time" to protected expression support substantial factor finding).

27        For all these reasons, the Subpoena should be quashed.

28

1

**III.    The Court Should Decide This Motion as Soon as Possible.**

2          Doe respectfully requests that this motion be heard and decided as quickly as possible. In the

3  typical case where a government agency issues an administrative subpoena seeking records, the urgency

4  of judicial review to protect a person's privacy may not be present. But in cases such as this one where

5  "an administrative subpoena is directed to a party other than the holder of a privacy interest in the targeted

6  items, the rights-holder will often *not* be afforded an opportunity to object on constitutional grounds,"

7  and—unless the recipient has a reason to resist it—the subpoena will be "for all practical purposes self-

8  executing." *Hell's Angels Motorcycle Corp. v. Cnty. of Monterey*, 89 F. Supp. 2d 1144, 1151 (N.D. Cal.

9  2000).

10          To the extent that DHS might argue the Court should defer a ruling until DHS decides to seek

11  enforcement of the administrative subpoena, DHS is wrong. Doe has a statutorily protected privacy

12  interest in the subpoenaed data and no reasonable opportunity for an adversarial proceeding to object to

13  the Subpoena before this privacy interest is lost, other than this Motion to Quash. This is a situation that

14  entitles Doe to pre-enforcement judicial determination. *See Hell's Angels*, 89 F. Supp. 2d at 1153. This

15  Court's intervention is the only process that can protect Doe. *See Abbott Lab'ys v. Gardner*, 387 U.S.

16  136, 153 (1967) (legal issue may be fit for pre-enforcement review where review is not otherwise

17  precluded by law and withholding judicial consideration would result in undue hardship) (abrogated on

18  other grounds by *Califano v. Sanders*, 430 U.S. 99 (1977); *cf. Wearly v. Fed. Trade Comm'n*, 616 F.2d

19  662, 667–68 (3d Cir. 1980) (applying trilogy of *Abbott Laboratories* cases to find that pre-enforcement

20  review of subpoena was not yet ripe because the plaintiff-recipient had failed to explain how non-

21  compliance would place him on the "horns of a dilemma").

22          This Court's urgent intervention is necessary to protect Doe's fundamental constitutional rights

23  and a ruling is required to prevent the government from trying to silence speech it does not favor, as well

24  as to dissuade such governmental abuses of subpoena power in the future.

25

26

27

28

1

**CONCLUSION**

2          For the reasons stated above, Doe requests that the Court issue an interim order directing Google

3   not to produce the information pending final resolution of this matter. Doe further requests that the

4   Court issue an order quashing the Subpoena.

5

6   Dated: February 2, 2026                    Respectfully submitted,

7

8                                              */s/ Jacob A. Snow*
                                               Jacob A. Snow (SBN 270988)
9                                              Nicolas Hidalgo (SBN 339177)

10                                             AMERICAN CIVIL LIBERTIES UNION
                                               FOUNDATION OF NORTHERN CALIFORNIA, INC.
11
                                               Jennifer Stisa Granick (SBN 168423)
12
                                               AMERICAN CIVIL LIBERTIES UNION FOUNDATION
13
                                               Nathan Freed Wessler (*pro hac vice* to be filed)
14                                             Scarlet Kim (*pro hac vice* to be filed)

15                                             AMERICAN CIVIL LIBERTIES UNION FOUNDATION

16                                             Stephen A. Loney, Jr. (*pro hac vice* to be filed)
                                               Ari Shapell (*pro hac vice* to be filed)
17
                                               AMERICAN CIVIL LIBERTIES UNION OF
18                                             PENNSYLVANIA

19                                             *Attorneys for Movant John Doe*[24]

20

21

22

23

24

25

26

27

28

[24] Counsel thank law graduate (admission pending) Byul Yoon for her contributions to this motion.