# Exhibit B

# The Washington Post
*Democracy Dies in Darkness*

Sign in

EXCLUSIVE

# Trump administration makes misleading case in high-stakes asylum hearing

Homeland Security asked a judge to deport a man to Afghanistan, where he expects the Taliban to kill him. What happens next could affect thousands.

October 30, 2025

🎧 17 min     ✨ Summary



Taliban security personnel in Kabul in August, celebrating the fourth anniversary of their takeover of Afghanistan. (Wakil Kohsar/AFP/Getty Images)



By John Woodrow Cox

The U.S. government asked a judge this month to deport a father of two to Afghanistan, where he expects the Taliban to kill him. To make its

1/29/26, 1:33 PM
Homeland Security makes misleading case in high-stakes asylum case - The Washington Post
Case 5:26-mc-80026    Document 1-3    Filed 02/02/26    Page 3 of 18

case, the Department of Homeland Security did not accuse him of any crime or disloyalty or act of terrorism. Instead, attorneys argued that Afghanistan — a country U.S. forces rescued him from in 2021 — is safe for his return.

The man, whom The Washington Post is identifying as H because of concern for his safety, has sought asylum because he so publicly supported the United States' cause in Afghanistan. Before fleeing, he worked for a U.S.-based nonprofit and attended an American university in Kabul.

To undermine his claim, government attorneys argued that the Taliban have allowed those institutions to continue to operate — clear signs, they suggested, that his past would not endanger him if he was deported.

Both institutions, however, have fundamentally transformed since H left them, The Post has found. The nonprofit's U.S. headquarters closed years before the country collapsed, and its former office in Afghanistan is now under strict Taliban supervision. The university, meanwhile, no longer provides in-person classes, and its campus was seized by the regime, which installed its own school.

***Read more:*** [He supported the U.S. war in Afghanistan. Now he may be deported to the Taliban.](#)

The stakes of the case, which will soon resume in a Virginia courtroom, extend to tens of thousands of asylum seekers from Afghanistan whom President Donald Trump's administration may seek to purge. If Attorney General Pam Bondi or an immigration appellate board dominated by Trump appointees ultimately sides with Homeland Security, legal experts say the case could set a precedent with sweeping consequences for Afghans the U.S. rescued and promised to support.

"It's worrying," said Anam Petit, a former immigration judge who was also a Georgetown Law professor. "The broader ramification is that many asylum seekers from Afghanistan who have similar or comparable facts will have a much harder, if not impossible, time being granted asylum."

Since America's 20-year war ended, some 200,000 Afghans have found refuge in the U.S. Many braved extraordinary danger on the U.S.

1/29/26, 1:33 PM
Case 5:26-mc-80026    Document 1-3    Filed 02/02/26    Page 4 of 18
Homeland Security makes misleading case in high-stakes asylum case - The Washington Post

government's behalf, and the overwhelming majority came here legally.



Follow Trump's second term

The Trump administration has dismantled programs created to assist them, canceling humanitarian parole and other protections that allowed Afghan allies to remain while their cases were processed. Without those safeguards, many could be sent back to a regime so brutal and repressive the U.S. refuses to recognize it.

Even Afghans forced to return from countries other than the U.S. have suffered. A July United Nations report details "cruel, inhuman or degrading treatment or punishment, enforced disappearance or other irreparable harm."

Both the man in custody and his wife have family in Afghanistan, and because of the Taliban's documented history of retribution, The Post is withholding certain details about their lives.

Immigration and Customs Enforcement officers detained H in July while he drove to his job at an accounting firm, as The Post reported in a previous story. The arresting officer, H said, claimed his immigration documents had lapsed, but federal records show his humanitarian parole wasn't scheduled to expire for weeks.

In a statement to The Post, Assistant Homeland Security Secretary Tricia McLaughlin called H "illegal" and an "unvetted alien from a high threat country," though she later acknowledged describing him as "illegal" only because her department revoked his parole when it arrested him.

At the hearing, department attorneys noted to the judge that the Taliban had not specifically targeted H before he escaped — compelling evidence, a government attorney claimed, that the militants would not target him now.

That is not true, according to two Taliban experts who spoke to The Post and extensive documentation that details the regime's systemic abuses.

Homeland Security did not respond to a request for comment on The Post's findings.

1/29/26, 1:33 PM
Case 5:26-mc-80026    Document 1-3    Filed 02/02/26    Page 5 of 18
Homeland Security makes misleading case in high-stakes asylum case - The Washington Post

In interviews and court testimony, H has said there are many reasons the Taliban would target him if he returned: He worked for the nonprofit and attended American University of Afghanistan; he rejects the militants' extreme view of Islam; he escaped on a U.S. military plane; he lives with his brother, a naturalized citizen who served as an interpreter for the Army; he's raising his children, both citizens, in Virginia.

H has been repeatedly vetted by investigators from the military, Homeland Security and FBI over the past four years, he said, and he's answered every question asked of him. He is certain the Taliban know that he and his family support the U.S.

"There is no chance of living," he testified at the asylum hearing on his 99th day in federal custody.

## 'Absolutely not evidence'



H's wife and their son watch the deportation hearing online. (Carolyn Van Houten/The Washington Post)

Much of the government's case — presented at a three-hour hearing in immigration court on Oct. 16 — focuses on the U.S.-backed nonprofit in Afghanistan where H taught teenagers how to use computers a decade ago.

Early in the hearing, H's attorney, Amin Ganjalizadeh, asked if he knew what became of the nongovernmental organization, or NGO, after he left the teaching job to pursue his education.

H told the court he had tried to contact the NGO's American office in recent years for a recommendation letter. "I have called them many times. I have emailed them many times. Nobody responds."

About two years ago, H added, a former colleague who had fled to Turkey told him the organization's primary headquarters, based in the U.S., had closed.

The lead attorney for Homeland Security, Joseph Dernbach, seized on that testimony, suggesting it was wrong. He pressed H about why he had not asked the colleague to provide the government a letter confirming the U.S. office's closure.

"Wouldn't it have been important to update this court with the status of whether the NGO … was actually in existence or whether it was closed?" Dernbach asked.

H didn't understand why that would have been necessary.

"I'm a regular person," he replied. "How will I know what will be asked from me?"

Before the hearing, Homeland Security submitted to the court screenshots of the Facebook page for the organization, which posted earlier this year. To rebut H's testimony after the hearing adjourned, the department sent the judge additional images of the NGO's website as further proof that it remains open inside the country.

To H's attorney, the department's line of questioning made its contention clear: If the Taliban had allowed an NGO led by infidels to continue operating instead of killing or arresting its local staff, how could H claim he would suffer such a fate upon his return?

But the government overlooked or omitted a critical detail, The Post found: The NGO now has an inherently different identity. Its U.S. headquarters closed five years before the Taliban took over, leaving its local operation entirely to Afghan leadership. They now run it under the authoritarian regime's exacting oversight.

Three former board members of the U.S. nonprofit that managed the NGO told The Post that the organization shut down because it lacked

funding. Their account is supported by 2016 state filings and an archived webpage announcing that the nonprofit "has made the very difficult decision to dissolve the corporation and to close its operations in the United States."

Even if the organization was still headquartered in the U.S., that would not support the government's argument to deny H asylum, a leading Taliban expert told The Post.

"That is absolutely not evidence that he would be safe," said Ashley Jackson, co-director of the Centre on Armed Groups. "NGO workers or people who are formerly affiliated with NGOs face a lot of threats and suspicion. ... They're coerced. They're pressured. They're threatened. They're beaten."

One current manager at the Afghan NGO confirmed to The Post that it has been locally managed for a decade. He spoke on the condition that he not to be identified because he fears retribution by the Taliban, which, the manager said, constantly monitors groups like his and often confiscates laptops and cellphones.

"During the previous government, NGO workers were targeted everywhere," he said. "They were enemies, like soldiers."

Since the Taliban took control of all 34 provinces, humanitarian efforts have become far more difficult, he said, and the danger to any previous worker returned to Afghanistan from the U.S. would be immense.

"Nobody can say there is no risk for the deportees," he said. "Everyone is scared and have fear and is eager to leave."

## 'Under control of Taliban'

1/29/26, 1:33 PM
Homeland Security makes misleading case in high-stakes asylum case - The Washington Post
Case 5:26-mc-80026    Document 1-3    Filed 02/02/26    Page 8 of 18



Outside the former American University of Afghanistan in 2024. An official says the school is "not physically operational." (Wakil Kohsar/AFP/Getty Images)

The American University of Afghanistan had long been a symbol of Western ideals in Kabul, and H was proud of that. He had been forced to abandon his education there when he fled to the U.S., but his relationship with the school dated back years.

In 2016, he'd been reading an accounting textbook in the library when the Taliban detonated a car bomb outside and opened fire on campus, killing at least 15 people.

At the hearing, prosecutors grilled him about the school and suggested it was still operating, implying that he was lying and could safely return to the city.

"Sir, you stated that American University in Afghanistan is shut down, correct?" asked government attorney Xiao Yan Huang.

"Yes."

"So your testimony is that there are no more students attending American University in Afghanistan, correct?"

"I don't know about the students, but the university is shut down," H replied. "So the university is under control of Taliban."

Huang announced that Homeland Security intended to submit evidence rebutting H's claims about the school: "Based on today's testimony about essentially the existence of American University within Afghanistan."

His attorney suspected that Homeland Security hoped to damage his credibility and, by extension, his entire case.

But a senior university official who also left when the country collapsed confirmed to The Post that the school is "not physically operational" inside Afghanistan, noting that it has maintained some online classes.

"Our campus is not currently in our control," said the official, who spoke on the condition of anonymity. "We have no in-person educational program today."

Said the manager from the Afghan NGO: "It's totally closed."

The Taliban installed their own school on the campus. The Afghan International Islamic University, which did not answer calls or respond to an email from The Post, describes its mission this way: "Our biggest goal here is to provide committed and polite professionals to the community."

The Taliban have barred women from attending, and across the country, girls are prohibited from going to school beyond sixth grade.



High school students receive cash from Habibullah Agha, the Taliban education minister, in Kabul. Girls are not permitted to go to school beyond the sixth grade. (Wakil Kohsar/AFP/Getty Images)

On Tuesday, government attorneys submitted to the court new rebuttal evidence, including a 2022 news article that highlighted the university's

president saying he and his staff had tried to destroy student records before he departed the country. A second article the government submitted, published in April, told the story of an Afghan woman attempting to take online classes but whose scholarship had been threatened by Trump's cuts to the U.S. Agency for International Development; the woman remained anonymous in the story because she feared the Taliban would target her for defying its ban.

Ganjalizadeh said he doubted that the exhibits would hurt his client's case and, in fact, wondered if they would help.

H and his wife had bonded from the start of their marriage over a shared devotion to education. He fled Afghanistan with only two shirts but more than a dozen diplomas, report cards and academic certificates. In Virginia, after years of working for ride-sharing services and a furniture factory, he had gotten a job as a bookkeeper and made a plan to take the certified public accountant exam. She was learning English through a program at a church in Virginia and attending classes to become a doula.

If they were sent back to Afghanistan, she would never finish her degree or pursue a career, and their daughter, who learned to count to 10 in English before she turned 2, would never attend high school or college or, as her father has prayed, grow up to become a scientist at NASA.

## 'Apples and oranges'



Amin Ganjalizadeh, H's attorney, worries the case will be reviewed by the Board of Immigration Appeals. (Carolyn Van Houten/The Washington Post)

If H was so certain the Taliban would hurt him now, the prosecutor demanded at the hearing, why hadn't the terrorists hurt him before he fled the country?

Though H had narrowly avoided bombings and firefights, he acknowledged that he had not been harmed.

"Not physically, but emotionally. It affected me so much," he said, later describing the frequent attacks. "I had good luck."

Dernbach continued to press. "You would agree that if the Taliban wanted to target you specifically, they could have?"

H's attorney objected, arguing the country's condition before the United States' withdrawal was irrelevant.

The judge seemed to agree.

"Now the Taliban government is in power," said the judge, whom The Post is not naming to prevent H's identification. "It is a different ballgame. Everything you're asking him about is pre-collapse. ... It's apples and oranges."

"But it's still the Taliban," the prosecutor replied, arguing that if they were going to attack H because of his education, they would have done it when they had the chance: "There would have been evidence that he was actually being persecuted."

In interviews with The Post, experts who have studied the Taliban for years dismissed the government's argument as false.

"Why would it be a prerequisite that they would have to target you before?" Jackson said. "There's a huge track record of these things happening to Afghans who did not face direct personal attacks prior to the fall of Afghanistan. Why should he be any different?"

Along with the U.N., human rights groups, research agencies and governments, including the one attempting to deport H, have chronicled such abuses extensively.



H's wife has been studying to become a doula. (Carolyn Van Houten/The Washington Post)

"He would be a prime target for Taliban hostage-taking, which essentially epitomizes a long-standing use of kidnappings as a strategic weapon," said Melissa Skorka, a national security expert who advised U.S. and NATO forces in South Asia. "The strategy has long been leveraging hostages for propaganda, concessions and legitimacy."

The Taliban view Afghans who fled to the U.S. in a fundamentally different way than it does university students and humanitarian workers who remained, according to the manager at the Afghan NGO, whose assessment was confirmed to The Post by two counterterrorism experts.

"The people that escaped or evacuated with the U.S.A.," he said, "they

will be considered spies."

There is little debate over how the Taliban treat suspected spies. For years, the State Department, U.N., European Union and human rights organizations have chronicled their fates: arrest, torture, death.

## 'Structural defect'



A recent aerial view of Kabul, now completely under control of the Taliban. (Carolyn Van Houten/The Washington Post)

What H's case means for tens of thousands of other Afghans in the U.S. will depend not on the judge's decision, but on what happens after it.

To be eligible for asylum, H needs only to establish a "well-founded fear" — even just a 10 percent chance — that he would be persecuted because of his religion, politics or family ties, a threshold set by the Supreme Court nearly 40 years ago. If H's claim is granted, his attorney worries that Homeland Security will ask for a review from the Board of Immigration Appeals, which can set a legal precedent all immigration judges must follow.

The immigration court system is under intense pressure from the Trump administration. Unlike federal judges, who receive lifetime appointments meant to ensure independence, immigration judges work for the Justice Department. More than 80, according to their national

association, have been fired since Trump took office, an unprecedented shift from past practice.

Immigration courts are rejecting asylum claims at a far higher rate than in previous years. Judges denied 76 percent of them between February and August, according to an analysis of data collected by the Transactional Records Access Clearinghouse at Syracuse University. That represents a 24 percent increase over the same period last year.

The appellate board has also been transformed. In February, the Trump administration removed all nine members appointed under former president Joe Biden, drawing condemnation from dozens of congressional Democrats. In a case as high-profile as H's, legal experts question whether the board would defy the administration.

"They don't have to convince the Board of Immigration Appeals. They own the Board of Immigration Appeals," said a former Homeland Security attorney who spoke on the condition of anonymity, fearing professional retribution.

Even if the board sides with H, the experts say, Bondi, the attorney general, can review its decision and set binding precedent on her own.

In a statement to The Post, a Justice Department spokesperson accused the Biden administration of "pressuring judges to engage in biased decision making based on preferred policy outcomes and harassing or removing Board judges who decided cases fairly, impartially, and in accordance with the law," adding that "most" staff members at the Executive Office for Immigration Review "welcomed the restoration of the Board's integrity, impartiality, and decisional independence since President Trump took office."

The department did not explain how it reached that conclusion.

Dana Leigh Marks, who served as an immigration judge for 35 years, called the board's overhaul "unconscionable."

In June, its members overturned a judge's decision to protect a man from deportation because he feared being tortured in a Salvadoran prison. In their ruling, they dismissed the judge's reliance on a documented history of abuse suffered by other Salvadorans in similar circumstances. Because the board published that opinion, it set a precedent immigration judges are now required to honor.

1/29/26, 1:33 PM
Homeland Security makes entire-acting case in high-stakes asylum case - The Washington Post
Case 5:26-mc-80026 Document 1-3 Filed 02/02/26 Page 15 of 18

"Their logic there was unbelievably flawed," Marks said. "What is happening in the immigration courts and at the Board of Immigration Appeals is such a radical departure from how things were handled in the past."

Petit, one of the judges fired without cause this year, blamed the conflicts of interest on a "structural defect" that has placed the immigration court system under the ultimate rule of one person: the president.

If the board or attorney general weighs in on H's case, lawyers on either side could ask the U.S. Court of Appeals, which Trump does not oversee, to intervene. But the federal appellate panel can take a year or more to issue an opinion, and by then, the experts say, it could be too late for hundreds or thousands of Afghan asylum seekers whose futures had been decided.

*Razzan Nakhlawi contributed to this report.*

Comments

**More Investigations**  HAND CURATED



Amid anti-DEI push, National Park Service rewrites history of Underground Railroad

April 6, 2025



More than 3,100 students died at schools built to crush Native American cultures

December 22, 2024



The 'perfect' predator

December 18, 2024

View 3 more stories

 By **John Woodrow Cox**
John Woodrow Cox is an enterprise reporter at The Washington Post. He is the author of Children Under Fire: An American Crisis and was a finalist for the 2018 Pulitzer Prize in feature writing. Reach him on Signal @johnwoodrowcox.01. 𝕏 **@JohnWoodrowCox**

Sign up

# The Washington Post

| Company | Sections | Get The Post | Contact Us | Terms of Use |
|---|---|---|---|---|
| About The Post | Trending | WP Intelligence | Contact the Newsroom | Digital Products Terms of Sale |
| Newsroom Policies & Standards | Politics | Enterprise Subscriptions | Contact Customer Care | Print Products Terms of Sale |
| WP Creative Group | Elections | Manage Your Subscription | Contact the Opinions Team | Terms of Service |
| Diversity & Inclusion | Opinions | Become a Subscriber | Advertise | Privacy Policy |
| Careers | National | Gift Subscriptions | Licensing & Syndication | Cookie Settings |
| Media & Community Relations | World | Mobile & Apps | Request a Correction | Submissions & Discussion Policy |
| Accessibility Statement | Style | Newsletters & Alerts | Send a News Tip | RSS Terms of Service |
| | Sports | Washington Post Live | Report a Vulnerability | Sitemap |
| | Business | Reprints & Permissions | | Ad Choices |
| | Climate | Post Store | | |
| | Well+Being | Books & E-Books | | |
| | D.C., Md., & Va. | Print Special Editions Store | | |
| | Obituaries | Print Archives (Subscribers Only) | | |
| | Weather | Today's Paper | | |
| | Arts & Entertainment | Public Notices | | |
| | Recipes | | | |

washingtonpost.com © 1996-2026 The Washington Post

**The Washington Post**
*Democracy Dies in Darkness*

past."

Petit, one of the judges fired without cause this year, blamed the conflicts of interest on a "structural defect" that has placed the immigration court system under the ultimate rule of one person: the president.

If the board or attorney general weighs in on H's case, lawyers on either side could ask the U.S. Court of Appeals, which Trump does not oversee, to intervene. But the federal appellate panel can take a year or more to issue an opinion, and by then, the experts say, it could be too late for hundreds or thousands of Afghan asylum seekers whose futures had been decided.

*Razzan Nakhlawi contributed to this report.*

💬 1,241 Comments

**DRS1234**  3 months ago

This is outrageously indefensible. Who in all the low information kults would defend such an action against men who helped keep our troops alive in Afghanistan?

5   React

**spreckair**  3 months ago

As a retired US government employee who specialized in asylum and refugee law, I am appalled by the government's position and embarrassed by the government attorneys lack of reality. This is yet another black mark on the meaning of America.

6   1